**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **DEBRA ANN AQUILINA,** | Civil Action No. 17-2243 (SDW) |
| **Petitioner,** | |
| v. | OPINION |
| **WILLIAM ANDERSON, et al.,** | |
| **Respondents.** | |

**WIGENTON**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Debra Ann Aquilina ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court conviction (ECF No. 1). Following this Court's Order to Answer, the State filed a response to the petition (ECF Nos. 4). Petitioner did not file a reply. For the following reasons, this Court will deny the petition and deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming Petitioner's conviction and sentence, the Superior Court of New Jersey – Appellate Division provided the following summary of the factual basis of this matter:

> At approximately 6:00 a.m. on February 15, 2003, the Garfield Police Department received a telephone call from [Petitioner] stating that when she awoke, she noticed that her husband Ralph Ludvik, Jr., was not breathing. A few minutes later, when Sergeant John Demko arrived at [Petitioner] and Ludvik's residence on Palisade Avenue, [Petitioner] directed him to the second floor of the home, where he saw Ludvik lying face up on the floor, wedged between a wall and the bed. Because there was no light in the bedroom, Demko dragged Ludvik to the kitchen. While Demko was in the course of doing so, [Petitioner] attempted to grab something from her husband's pocket. Demko told her to stop. At that point,

1

[Petitioner] became upset, telling Demko she was merely trying to retrieve money that was hers. According to Demko, there were signs of rigor mortis and he believed that Ludvik had been "deceased for quite some time." Paramedics arrived shortly thereafter, and pronounced Ludvik dead at 6:18 a.m.

While Demko was in his patrol car outside [Petitioner]'s and Ludvik's home completing a form to be provided to the medical examiner, [Petitioner] approached him in a "flirtatious" manner and said, "I've seen you before, I've seen you around. How are you?" According to Demko, [Petitioner] was not "crying" or "showing any signs of grief at that point in time."

At 6:30 a.m., Detective Michael Latona of the Garfield Police Department arrived at the scene and spoke with [Petitioner], who informed him that she was Ludvik's wife and that her husband was a heroin user. She pointed to empty bags in the bedroom that appeared to contain trace amounts of heroin. In a dresser drawer, Latona also observed drug paraphernalia, including syringes, plastic tubes and a tourniquet, although Latona was unable to find the syringe that caused the apparent overdose.

Latona also interviewed James Gerritsen, who had moved into the house a few weeks earlier. Gerritsen told Latona that he had gone to sleep at 10:30 p.m. the previous night, and was awakened by defendant at 5:30 a.m. the next morning, who stated that Ludvik was not breathing. Gerritsen explained that Ludvik's temperament of late had been "somewhat odd," and Ludvik "had been more angry and not his normal self."

Latona did not interview [Petitioner's son], Mark Aquilina, who also lived in the home.

A toxicology report prepared by Theodore Siek, Ph.D., at the request of the medical examiner, Dr. Sunandan Singh, attributed Ludvik's death to an overdose of heroin. Cocaine was also found in his blood, but not in an amount sufficient to have caused his death. Based on the report of the toxicologist, and the drug paraphernalia found in Ludvik's bedroom, Dr. Singh concluded that Ludvik's death was the result of an accidental drug overdose.

Singh's conclusion remained unchallenged until fifteen months later, when on May 11, 2004, the Bergen County Prosecutor's Office received a letter from Frank Baez, an inmate at the Bergen County Correctional Facility, where Mark Aquilina, defendant's son, was incarcerated on unrelated charges. Baez's letter

made reference to a comment by Mark Aquilina admitting that he had been involved in a suspicious death that occurred in Garfield. Contacting the Garfield Police Department, the Prosecutor's Office learned of Ludvik's death due to a drug overdose in February 2003. After interviewing Baez, Detectives Gil Breit and Mark Bendul brought Mark Aquilina to the Bergen County Prosecutor's Office for questioning on March 4, 2005.

After receiving [the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966)], Mark initially denied taking part in Ludvik's murder. After further questioning, he provided a full confession about a conspiracy to kill Ludvik, between [Petitioner], Gerritsen and himself. Mark explained that his mother believed that if Ludvik were dead, she would inherit the house on Palisade Avenue where Mark, [Petitioner], Gerritsen and Ludvik had been living. According to Mark, the three devised a plan "to somehow take over the house," which involved "taking care of Ralph" by "getting him out of the way." Mark explained that the only reason his mother married Ralph Ludvik was "to get her hands on the house."

Mark explained that on the day of Ludvik's death, Ludvik had driven to Paterson to buy cocaine. While he was gone, [Petitioner] and Gerritsen discussed "ways of getting rid of [Ludvik,]" and devised a plan to "give him a drug overdose." In furtherance of that plan, Mark dissolved nearly four bags of heroin, and drew the heroin solution into a syringe, knowing that such quantity was a lethal dose. Mark admitted that following a signal from [Petitioner], he handed the syringe to an unsuspecting Ludvik, who injected the heroin into his arm. Ludvik immediately clutched his chest, and dropped to the floor unconscious. Mark explained that while Ludvik was unconscious, [Petitioner] rifled through Ludvik's pockets and removed whatever cash she could find. Afterward, he and [Petitioner] "part[ied] through the night." Shortly before 6:00 a.m., they returned to the bedroom, realized Ludvik was dead, and called the police.

In the March 4, 2005 statement that Mark provided to Detectives Breit and Bendul, he also explained that during the time his mother was married to Ludvik, she was "fooling around" with Gerritsen, and that his mother and Gerritsen intended to "get together" after Ludvik was dead.[1]

---

[1] The Appellate Division noted that Mark Aquilina was tried and convicted separately. (Document 4 attached to ECF no. 3 at 7 n. 3).

Ultimately, Mark provided a twenty-seven page statement to Detectives Bendul and Breit, and on videotape, acknowledged that his statement was true. At [Petitioner]'s trial, Breit read Mark's entire statement to the jury, and played the videotape.

The State presented Mark's testimony at trial. After initially asserting his Fifth Amendment right to remain silent, Mark was granted immunity by the Attorney General. Confronted by the prosecutor with his March 4, 2005 statement to Detectives Breit and Bendul, Mark insisted that "it was all made up. Nothing ever happened. . . . It was all just a fictional account." He denied telling Baez that he participated in Ludvik's murder, and asserted that he neither "hot loaded" a syringe nor handed the deadly quantity of heroin to Ludvik.

The State also presented the testimony of Gerritsen, who denied any involvement in the plan to murder Ludvik. Gerritsen explained that he moved into the home on Palisade Avenue with [Petitioner] and Ludvik in the latter part of 2002, because Ludvik had lost his job, and Ludvik and [Petitioner] were experiencing financial difficulties. [Petitioner] and Ralph had married a few months earlier. Gerritsen testified that while they were all living together, [Petitioner] continually made disparaging remarks about Ludvik. He also testified that Mark suggested to [Petitioner] that she should loosen one of the stair rails, push Ludvik down the stairs and "make it look like an accident."

Gerritsen also testified, without objection, that while he was living in the house with [Petitioner], Ludvik and Mark, there were several occasions when [Petitioner] came into his room and crawled into his bed. When Gerritson protested, and told her she should be in bed with her husband, and not with him, she became "pissy," which he defined as "[a]ggravated."

The State also presented the testimony of Ludvik's father, Ralph Sr., who explained that before Ralph Jr.'s death, he, Ralph Sr., had explained to [Petitioner] that he believed title to the property on Palisade Avenue had passed to Ralph Sr.'s sister Jane after their mother's death. Ralph Sr. explained that [Petitioner] told him a lawyer had assured her that her husband, Ralph Jr., was the owner of the property.

In his testimony, Detective Breit described his interview with [Petitioner] at the Edna Mahan Correctional Facility, where [Petitioner] was incarcerated on unrelated charges involving the fraudulent use of a credit card. The jury was merely told that the

interview occurred in a "break room, interview room setting," with no mention of [Petitioner] being incarcerated. Breit testified that he began his interview with [Petitioner] by telling her that he was there to discuss the circumstances of her husband's death, at which time she immediately responded that he had died of a drug overdose. When Detective Breit handed [Petitioner] the pre-printed Miranda rights form, and explained that he needed to advise her of her constitutional rights, she became "hostile and irate." According to Breit, [Petitioner]'s agitation increased, and "her demeanor changed," when Breit told her he had already spoken with her son, Mark. [Petitioner] then demanded to know what Mark had told him, but Breit explained he was unable to provide her with any further information until she signed the Miranda rights card. At that point, [Petitioner] "became more hostile," "started to . . . cry and [became] upset and . . . was very agitated."

Breit testified that he was never able to interview [Petitioner] because his discussion with her "just went into . . . a circular conversation" in which he would try to elicit her cooperation and have her sign the Miranda rights card, while [Petitioner] would demand to know why it was necessary that she do so. Ultimately, after forty-five minutes, Breit terminated the interview when [Petitioner] said, "if you're not going to answer my questions, I'm not going to answer yours."

The State also presented Dr. Singh, who testified that after reading Mark Aquilina's March 2005 statement, he had not changed his earlier conclusion that Ludvik died from a drug overdose; however, Mark's statement caused him to alter his original conclusion that the death was accidental. Singh instead concluded that the manner of death was homicide. Dr. Singh conceded that if Mark's statements to the Prosecutor's Office were false, he would be obliged to revise his opinion accordingly.

The toxicologist, Dr. Siek, testified that the quantity of heroin found in Ludvik's blood was five times more than the therapeutic level of morphine.[2] Because the heroin had not been completely metabolized, Dr. Siek opined that it had been ingested only a few hours prior to Ludvik's death. In sum, Dr. Siek concluded that Ludvik died due to an overdose of morphine and cocaine.

At the conclusion of deliberations, the jury [convicted Petitioner of first degree murder in violation of N.J. Stat. Ann. § 2C:11-3, first degree conspiracy to commit murder in violation of

---

[2] As noted by the Appellate Division, Dr. Siek explained that heroin breaks down into morphine in the blood stream. (Document 3 attached to ECF No. 4 at 11 n. 4).

> N.J. Stat. Ann. §§ 2C:11-3 and 5-2, two counts of third degree
> possession of cocaine and heroin respectively in violation of N.J.
> Stat. Ann. § 2C:35-10(a)(1), and third degree hindering prosecution
> in violation of N.J. Stat. Ann. § 2C:29-3(b)(1)]. Prior to sentencing,
> [Petitioner] moved for acquittal and for a new trial. The judge
> denied both motions.

*State v. Aquilina*, 2012 WL 140851, at *1-5 (N.J. App. Div. Jan. 19), *certif. denied*, 210 N.J. 479

(2012). Following the merger of certain charges for sentencing purposes, Petitioner was ultimately

sentenced to a life sentence with an eighty five percent parole disqualifier on the murder charges,

concurrent five year terms on the two drug charges, and a five year term of imprisonment on the

hindering prosecution charge to run consecutive to all the other sentences. *Id.* at *1. Petitioner

appealed, and the Appellate Division affirmed her conviction and sentence. *Id.* The New Jersey

Supreme Court thereafter denied her petition for certification on June 8, 2012. *State v. Aquilina*,

210 N.J. 479 (2012).

Petitioner thereafter filed a petition for post-conviction relief in which she argued that she

had received ineffective assistance of counsel during her trial, which was denied without an

evidentiary hearing. *See State v. Aquilina*, 2016 WL 5746623, at *2 (App. Div. 2016), *certif.

denied*, 228 N.J. 474 (2017). Petitioner appealed, and the Appellate Division affirmed the denial

of post-conviction relief. *Id.* The New Jersey Supreme Court denied certification on January 20,

2017. *State v. Aquilina*, 228 N.J. 474 (2017). She thereafter filed her present habeas petition.

(ECF No. 1).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of

habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on

the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 567 U.S. 37, 40-41 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. Analysis**

**1. Expert Testimony and Evidentiary Claims**

In two of her claims, Petitioner asserts that the expert testimony admitted at her trial regarding the cause of her husband's death was inadmissible as it was little more than a "net opinion," and the trial court should therefore have advised the jury to disregard that testimony. In these claims, Petitioner essentially challenges the admissibility of the expert opinion testimony presented at trial. Because "the Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules," *see Marshall v. Lonberger*, 459 U.S. 422, 438 (1983), the admissibility of evidence is normally considered a question of state law which is not cognizable in habeas corpus. *See Keller v. Larkins*, 251 F.3d 408, 416 n. 2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); s*ee also Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991); *Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009). Because habeas relief is only available to remedy violations of federal law and does not provide an avenue for relief based on alleged errors of state law, a habeas petitioner may raise a habeas claim based on a state law evidentiary issue only where she can show that the admission of the evidence in question denied her Due Process under the Fourteenth Amendment by depriving her of the "fundamental elements of fairness in [her] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)). "The Supreme Court has 'defined the category of infractions that violate 'fundamental fairness' very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 443 (1992)). "In order to satisfy due process, [Petitioner's] trial must have been

fair, it need not have been perfect." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)).

Thus, a Due Process violation will only occur in the context of a state court evidentiary ruling

when that ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair."

*Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano*

*v. Oklahoma*, 512 U.S. 1, 12-13 (1994)).

In her petition, Petitioner challenges two evidentiary decisions of the state trial court – the

decision to permit Dr. Singh, the medical examiner, to testify that the cause of the victim's death

was murder, which she contends was inadmissible as a "net opinion," and the trial court's denial

of her motion to strike the testimony of Dr. Siek,[3] the State's toxicology expert, as a net opinion

and for exceeding the scope of his written report.[4]   As the Appellate Division explained in

affirming Petitioner's conviction, an expert witness in New Jersey state court must explain the

basis for his opinions and provide the "[why] and wherefore of his or her opinion," and expert

testimony without such a basis may be excluded as an improper net opinion.  *See Aquilina*, 2012

WL 140851, at *8 (quoting *State v. Townsend*, 186 N.J. 473, 494 (2006)).   New Jersey law

---

[3] In claim number four in her petition, Petitioner asserts that the trial court erred in denying a motion to strike the testimony of Dr. Singh.  It does not appear from the record that she made any such motion.  She did, however, move to strike the testimony of Dr. Siek.  (*See* Document 20 attached to ECF No. 4 at 4-14).  Because Petitioner mentions the motion to strike specifically, and because the third claim in her petition, which challenges the admission of Dr. Singh's testimony already addresses Dr. Singh, this Court construes Petitioner's claim four as addressing the motion with regard to Dr. Siek.  If Petitioner's intention was instead simply to make a second claim as to the admission of Dr. Singh's testimony, that claim would fail for the reasons discussed herein.

[4] Although Petitioner contends that her claims arise under the Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Daubert* applies to, and ultimately controls, only the Federal Rules of Evidence, which were not applicable to Petitioner's New Jersey state court trial.  *See, e.g., Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001) (noting that *Daubert* applies directly only to the Federal Rules of Evidence and that the admission of expert testimony in a state prosecution is a question of state, and not federal, law).  In interpreting New Jersey's analogue evidentiary rules, the New Jersey courts apply the *Frye* test which preceded *Daubert*, and thus *Daubert* is completely immaterial to any evidentiary contentions Petitioner presents.  *See, e.g., State v. Chun*, 194 N.J. 54, 91 (2008).

similarly prevents expert opinions in state criminal trials from providing "an opinion that [the] defendant was guilty of the crime charged." *Id.* (citing *State v. Odom*, 116 N.J. 65, 77 (1989)).

Petitioner's chief contention regarding Dr. Singh is that his testimony was improper because he altered the victim's cause of death from accidental to homicide based on the information Mark Aquilina provided in his confession, and because Dr. Singh admitted on cross examination that, were he to believe that Mark Aquilina lied in giving his confession, he would have to change the cause of death back to an accidental overdose. Petitioner appears to believe this is a net opinion and an opinion upon the ultimate issue in question in violation of the *Odom* rule because Mark Aquilina's recanted confession was not reliable and because Dr. Singh concluded that the cause of death was homicide. The Appellate Division rejected both of these contentions, noting that Dr. Singh was required by state law to consider all evidence in determining and redetermining the cause of death, and because Dr. Singh had fully explained in his testimony that his change in the cause of death was the result of considering Mark Aquilina's recorded confession to helping Petitioner kill her husband. *Id.* The Appellate Division likewise rejected the contention that Dr. Singh had offered an improper opinion under *Odom* as Dr. Singh had only testified that in his opinion, in light of the recorded confession, the victim's cause of death was homicide, and not that Petitioner had any part in that homicide. *Id.* Having reviewed the trial record and the decisions of the state courts, this Court perceives no clear error by the state courts in applying state evidentiary rules, and finds that Petitioner has utterly failed to show that the state courts' evidentiary rulings deprived her of "fundamental elements of fairness in [her] criminal trial," and Petitioner is therefore not entitled to habeas relief as to her claims regarding Dr. Singh. *Glenn*, 743 F.3d at 407.

Petitioner's claims regarding Dr. Siek are similarly meritless. Before the trial court, Petitioner argued that Dr. Siek's testimony exceeded the scope of his report insomuch as Dr. Siek provided explanations of the data contained in his reports at trial that were not included in the body of his report, such as his statement that that the dose of heroin in the victim's system was several times higher than ordinary while the levels of cocaine found in his system were normal for a habitual user and his explanation that heroin metabolizes into morphine. (Document 20 attached to ECF No. 4 at 4-14). The state courts rejected that argument, finding that the explanations provided by Dr. Siek were merely extrapolations and explanations of his report which provided jury with context for the drug quantities contained in his report necessary to understand why the doctor concluded that an overdose of heroin combined with smaller amounts of cocaine had caused the victim's death. (*Id.* at 14-15; Document 3 attached to ECF No. 4 at 22-23). Having reviewed the record, it is clear that Dr. Siek's testimony at trial was a fair explanation and extrapolation of the data contained in his expert report, and that his testimony was based on the evidence and was neither a net opinion nor an ultimate opinion as to Petitioner's guilt. As such, it does not appear that the state court's erred in admitting this evidence, and it is in any event clear that the admission of Dr. Siek's testimony did not deprive Petitioner of fundamental fairness in her trial. Petitioner is therefore not entitled to habeas relief as to the admission of either doctor's testimony. *Glenn*, 743 F.3d at 407.

## 2. Sufficiency of the Evidence Claim

Petitioner also asserts that the trial court erred in denying her motion for a judgment of acquittal, and in doing so essentially challenges the sufficiency of the evidence against her. When a petitioner presents a claim challenging the sufficiency of the evidence against her, "a reviewing

court must ask 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Eley*, 712 F.3d at 847 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A court sitting in habeas review may therefore overturn a conviction for insufficiency of the evidence only "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 324). "Under *Jackson*, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). Under this "deferential federal standard," juries have "broad discretion in deciding what inferences to draw from the evidence presented at trial" and federal courts must not "unduly impinge[] on the jury's role as factfinder" by engaging in "fine-grained factual parsing." *Id.* Thus, so long as a rational fact finder could find all of the essential elements of the charged crimes beyond a reasonable doubt given the benefit of all reasonable inferences and viewing the facts in the light most favorable to the State, a habeas claim based on the sufficiency of the evidence must fail.

The state courts in this matter rejected Petitioner's sufficiency of the evidence challenges, finding more than sufficient evidence to support Petitioner's conviction. A careful review of the trial record agrees with that conclusion. The record of this matter contains Mark Aquilina's recorded confession as to the plot to kill the victim he entered into with Petitioner, the testimony of the police officer as to Petitioner's strange behavior upon finding her husband dead, the testimony of Petitioner's housemate regarding her behavior just before the murder, and the testimony of the two doctors concluding that Petitioner died of a drug overdose. Viewing those facts in the light most favorable to the state, it is clear that a reasonable fact finder could conclude

that Mark Aquilina's confession, rather than his recanting of that confession upon his being charged with murder, was reliable given the other testimony regarding Petitioner's behavior and the expert scientific evidence, and that a reasonable jury could clearly have found that Petitioner was guilty of the charged crimes. As such, Petitioner's sufficiency of the evidence claim must fail. *Coleman*, 566 U.S. at 655.

### 3. Jury Instruction Claim

Petitioner next asserts that the trial court erred in its formulation of the "election" jury instruction, which addressed her decision not to testify at trial. That a jury "instruction was allegedly incorrect under state law is not a basis for habeas relief." *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert. denied*, 534 U.S. 919 (2001). Habeas relief is therefore available based on an allegation that a petitioner's jury instructions were improper only when "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). A court reviewing such a claim must consider the challenged jury instruction in the context of the entire charge and the trial as a whole. *Duncan*, 256 F.3d at 203. That the challenged instruction was "undesirable, erroneous, or even universally condemned," is insufficient to warrant habeas relief, a petitioner can only prevail on such a claim by showing that the instruction rendered her trial fundamentally unfair. *Id.*

Petitioner challenges the following jury instruction, which she herself requested be provided to the jury (*See* Document 20 attached to ECF No. 4 at 177-79):

> As you know, [Petitioner] elected not to testify at trial. It is her constitutional right to remain silent. You must not consider for any purpose or in any manner in arriving at your verdict the fact that [Petitioner] did not testify. That fact should not enter into your

> deliberations or discussions in any manner at any time. [Petitioner]
> is entitled to have the jury consider all evidence presented at trial.
> She is presumed innocent even if she chooses [not] to testify.

(Document 22 attached to ECF No. 4 at 106). Petitioner's chief issue with this charge on appeal, which she raises here as the basis to her challenge, was the fact that the transcript suggests that the trial judge left out the word not in the brackets above. The State argues, as it apparently did before the Appellate Division, that the "not" was present in the version read to Petitioner as part of the colloquy in which she requested the election charge, and that the omission of the "not" in the quoted text above was merely a typographical error on the part of the court reporter. The Appellate Division agreed with this conclusion on direct appeal, noting that the omission of the "not" did not fit with the remaining portions of the charge. *Aquilina*, 2012 WL 140851 at *10 n. 5. Ultimately, the Appellate Division rejected Petitioner's contention as, even if the omission of the "not" was not a typographical error, the election charge given "was consistent with the model jury charge" in effect at the time, and had no capacity to lead the jurors astray as it directly informed them not to consider Petitioner's decision not to testify in any way. *Id.* at *10.

Having reviewed the charge in the context of the greater jury charge, this Court agrees that the charge had no capacity to mislead the jury, and did not render Petitioner's trial fundamentally unfair. The charge directly told the jury not to consider "for any purpose or in any manner" Petitioner's decision not to testify, that Petitioner is presumed innocent regardless of her choice, and that they should not deliberate on the issue "in any manner at any time." The charge thus directly and correctly advised the jury that her decision not to testify should not be considered and that she should be presumed innocent unless proven otherwise. This Court is confident that this jury charge did not have the capacity to render Petitioner's trial fundamentally unfair, and Petitioner is thus not entitled to habeas relief on this basis. *Duncan*, 256 F.3d at 203.

## 4. Ineffective Assistance of Counsel Claims

In her two remaining claims, Petitioner asserts that she suffered ineffective assistance of trial counsel. The standard applicable to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a

"petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

In her first ineffective assistance claim, Petitioner contends that counsel was deficient in failing to call an expert witness, Dr. Taff, to rebut the medical examiner's determination that the victim's cause of death was homicide. Where a petitioner asserts ineffective assistance on the basis of counsel's failure to call certain witnesses, a reviewing court is "'required not simply to give [the] attorney[] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as he did.'" *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014). "*Strickland* requires that a defendant 'overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' 466 U.S. at 689 (internal quotation marks omitted). If the Government 'can show that counsel actually pursued an informed strategy (one decided upon after a thorough investigation of the relevant law and facts),' the effectiveness of counsel's assistance is 'virtually unchallengable.' *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005)." *United States v. Graves*, 613 F. App'x 157, 159 (3d Cir. 2015).

The state PCR trial court rejected Petitioner's claim, explaining as follows:

[Petitioner] raises ineffective assistance of trial counsel because trial counsel did not call Dr. Mark Taff, Forensic Pathologist, to testify and dispute the manner of death. Dr. Taff concluded that the victim died as a result of a multiple mixed drug intoxication, but indicated

16

that it was impossible to say with any certainty how much or when were the drugs taken or given to the victim.  Dr. Taff also concludes that[,] if not for the statements of Mark Aquilina and James Gerritsen[,] the manner of death would have been classified as an accident.

The Court agree[s] with the State in that Dr. Taff's Report was very similar to the conclusions of Dr. Singh who testified at trial as to the manner of death. . . . Dr. Taff's conclusion differs [only] in that he did not consider [Mark Aquilina's] confession in deciding the manner of death.

Trial counsel crossed Dr. Singh and used that cross examination to argue to the jury that the manner of death was accidental and not a homicide.  Therefore, this Court does not believe that trial counsel's strategy of using Dr. Singh's cross examination instead of calling Dr. Taff as an expert was outside of the wide range of professionally competent assistance.

Dr. Taff, as was just stated on the record, indicated [in his report] that if not for the statements of Mark Aquilina and James Gerritsen the manner of death would have been an accident.  And again, he did not take into consideration those statements.  So it was certainly feasible trial strategy since Dr. Singh's conclusions were identical.  Except [Dr. Singh] did consider [Mark Aquilina's confession].  Initially [Dr. Singh had] classified [the victim's death] as an accident.

(Document 24 attached to ECF No. 4 at 10-11).  The Appellate Division agreed, noting that

even if called as a witness, Dr. Taff would not have refuted the manner of death.  Dr. Taff agreed that [the victim] died as a result of his intoxication after ingesting multiple drugs.  His report stated "If not for the statements of Mark Aquilina and James Gerritsen, the manner of death would have been classified as an accident."  That is precisely the conclusion Dr. Singh made before Mark disclosed the murder plot.  There is no evidence Dr. Taff provided an opinion that refuted homicide as the manner of death after considering the details in Mark's confession.  As a result, no cognizable advantage to [Petitioner] was lost as a result of counsel's failure to call him as a witness.

*Aquilina*, 2016 WL 5746623 at *2.

As noted by the state courts, Dr. Taff at best would have provided testimony which agreed in all meaningful respects with the testimony of Dr. Singh – the victim died of a drug overdose which was initially classified as an accidental death and which was only classified as a homicide after Mark Aquilina confessed to the murder plot. Dr. Taff discounted that confession, while Dr. Singh emphasized it, and that is the only essential difference between Singh's trial testimony and Taff's purported testimony. Trial counsel on cross-examination was able to get Dr. Singh to readily admit that, if Mark Aquilina lied in his confession, the victim's death would not be classified as a homicide, and that the homicide determination rose and fall with the credibility of Mark's confessions. (*See* Document 20 attached to ECF No. 4 at 97-98). Indeed, Dr. Singh directly stated that, if Mark's statement were a "big lie," he would be "in a real dilemma and [he'd] change" the cause of death back to an accidental overdose. (*Id.* at 98-99). Thus, it is clear that counsel was able to elicit from Dr. Singh on cross all of the pertinent information that Dr. Taff could have provided – that the homicide determination depended entirely upon Mark's confession being truthful. Because counsel was more than able to present all of the information Dr. Taff could have provided while at the same time undercutting a key prosecution witness's cause of death determination, counsel's decision not to call Dr. Taff and instead to only pursue cross examination of Dr. Singh cannot be said to have been deficient performance. Likewise, because counsel did elicit all of the pertinent information Dr. Taff had to present, Petitioner was not prejudiced by the decision not to call Dr. Taff. Petitioner's claim therefore fails to establish either prong of *Strickland*, and her first ineffective assistance claim provides no basis for habeas relief.

In her final claim, Petitioner asserts that counsel was deficient in advising her not to testify on her own behalf, preventing her from asserting her innocence,[5] testifying that Mark Aquilina had mental issues and was a braggart, and from disputing the officer's testimony that she flirted with him just after her husband was found dead. Criminal defendants have an absolute right to testify on their own behalf, and the decision of whether to testify at trial can be made only by the defendant, not counsel on defendant's behalf. *See, e.g., United States v. Leggett*, 162 F.3d 237, 245-46 (3d Cir. 1998). Defense counsel, however, does have the duty to inform his client of his right to testify on his own behalf and advise him in making that decision. *See, e.g., United States v. Pennycooke*, 65 F.3d 9, 12 (3d Cir. 1995).

While Petitioner contends that counsel pressured her not to testify on her own behalf, her own statements during her trial suggest otherwise. A petitioner's "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73-75 (1977). "The subsequent presentation of conclusory allegations unsupported by specifics" which contradict those solemn statements is "subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Id.* At trial, Petitioner engaged in the following colloquy with the trial judge and counsel regarding her decision not to testify on her own behalf:

> [THE COURT:] Now that the State has rested, you have a choice to make in consultation with your attorney. You have three options. The first option is to exercise your absolute constitutional right to remain silent and to not take the witness stand. Okay. And then to ask me to refrain from commenting to the jury in any way concerning your decision not to testify. All right.
>
> The . . . second option is to exercise your right to remain silent and to have the Court . . . [give the jury the election charge discussed above].

[5] This Court notes that Petitioner did not claim that she would have asserted her own innocence before the PCR courts, although she now makes an allegation to that effect. (*See* Document 9 attached to ECF No. 4 at 7).

. . . .

Okay.  Your third option is to give up the right to remain silent and testify.  Okay?  You will then be cross-examined by the Prosecutor.  Okay?  Do you understand these three choices?

[Petitioner]: Yes, sir.

. . . .

THE COURT: And do you need additional time to speak to [counsel] regarding your decision?

[Petitioner]: We've already discussed it, sir.

THE COURT: All right.  And you have arrived at a decision as to how you wish to proceed?

[Counsel]: There's a form on Your Honor's desk.

THE COURT: You reviewed this with [Petitioner], [counsel]?

[Counsel]: Yes, I have.

THE COURT: All right.  And what is the decision that has been arrived at?

[Petitioner]: I thought he said I didn't want to testify.

THE COURT: I'm sorry.

[Petitioner]: I don't want to testify, sir.

THE COURT: All right.  You do not want to testify.  Is that correct?  All right.  Now do you wish me to read [the election charge] or did you wish me to not comment to the jury in any way concerning your decision not to testify?

[Counsel]: Do you understand the judge's question?

[Petitioner]: Not particularly, no.

[Counsel]: All right. The form you signed, [Petitioner], says you want the judge to read [the election charge] that he read out loud before to the jury. Was that correct?

[Petitioner]: Yes.

[Counsel]: You now you have the . . . ability to have the judge say nothing about your right . . . [to] not testify?

[Petitioner]: Yes.

[Counsel]: Do you understand that?

[Petitioner]: Yes.

[Counsel]: And . . . your choice that we agreed to on the form is that you wish the judge to explain to the jury that they're not entitled to take into consideration . . . your election not to testify. Is that correct?

[Petitioner]: Yes.

THE COURT: All right. Again, [Petitioner], just so we're clear. It's my understanding then that you have elected the second option. Okay. And, again, the second option is to exercise your right to remain silent. I would then instruct the jury they may not hold it against you in any way. Okay. [The judge then read the election charge to Petitioner again.] Okay. Do you understand all that?

[Petitioner]: Yes, sir.

THE COURT: All right. Is that in fact the option that you have chosen?

[Petitioner]: Yes, sir.

THE COURT: Do you have any questions of either myself or [counsel] regarding that?

[Petitioner]: No, sir.

(Document 20 attached to ECF No. 4 at 177-179).

Based on this colloquy, it is clear that Petitioner knew she had the right to testify on her own behalf if she so chose, that the decision was hers to make, and that she had the opportunity to discuss the matter with counsel or the trial court if she had any questions or concerns regarding her decision not to testify on her own behalf. Petitioner chose, after consulting with counsel, not to testify, and in no way suggested that she wished to testify during her colloquy with the trial court. The PCR courts therefore rejected her claim that she wished to testify on her own behalf and was advised not to do so as belied by the record. Petitioner has failed to show that this determination involved an unreasonable application of *Strickland* or the facts of her case, and as such has failed to show that her counsel's performance was deficient in this respect.

Petitioner provides the Court with no information regarding what advice she was given other than that counsel advised her not to testify, and provides little more than her own assertions that she wished to testify and as to what facts she would have provided had she testified. Petitioner certainly provides no reason for this Court to conclude that there is a reasonable probability, but for her decision not to testify, that the result of her trial would have been different. Because Petitioner has not shown that the result of trial would likely have been different had she testified on her own behalf, she has failed to show *Strickland* prejudice. *Shedrick*, 493 F.3d at 299. Thus, even if the record did not call into question Petitioner's assertions that counsel gave her poor advice regarding the decision not to testify and that counsel made a strategic choice to tell her not to testify, Petitioner would still be unable to establish a *prima facie* claim of ineffective assistance of counsel, and her final claim is without merit. Petitioner has thus failed to establish her entitlement to habeas relief as to any of her claims, and her petition is denied as a result.

**III. CERTIFICATE OF APPEALABILITY**

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because all of Petitioner's habeas claims are without merit for the reasons expressed above, she has failed to make a substantial showing of a denial of a constitutional right, and her petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

Dated: December 7, 2017                               ***s/ Susan D. Wigenton***
                                                      Hon. Susan D. Wigenton,
                                                      United States District Judge